Edward L. VANDEVENTER, Jr., Appellee,

v.

LOCAL UNION NO. 513 OF the INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Appellant.

Nos. 77–1503, 77–1562.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1978.

Decided July 5, 1978.

Barry J. Levine of Gruenberg, Souders & Levine, St. Louis, Mo., for appellant Local Union No. 513, etc.

Lester H. Goldman, St. Louis, Mo., for appellee.

Before BRIGHT, STEPHENSON and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

Edward L. Vandeventer, a member of Local Union No. 513 of the International Union of Operating Engineers, AFL–CIO (the Union), brought an action against the Union alleging that he had been disciplined without being afforded the procedural protections required by section 101(a)(5) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(5) (1970).[1] Jurisdiction rests on 29 U.S.C. § 412 (1970).[2] The district court[3] entered judgment in accordance with a jury verdict awarding Vandeventer $25,000 actual damages and $10,000 punitive damages. The Union appeals the judgment, urging as error the district court's denial of its motion for judgment n.o.v. or new trial (No. 77–1503). Vandeventer cross-appeals, alleging error in the district court's denial of his request for attorney's fees (No. 77–1562). We remand the issue of attorney's fees to the district court for further consideration. On all other issues, we affirm.

## I. Background.

The Union maintains a hiring hall system for referring workers to jobs. A contractor requiring an operating engineer to operate construction machinery notifies the Union. The Union then dispatches members who are qualified and available, first preference being given to those who have been out of work for the longest period of time.

Vandeventer has been a member in good standing since 1963 and is qualified to operate various types of construction equipment. Although he registered with the Union's hiring hall, Vandeventer's availability for work may have been limited at times because he had expressed a preference for work at only one work site and, in addition, ran a bus company.

Prior to September 1974, Vendeventer worked an average of 133 hours per month; after that date, he averaged only 9 hours per month. In November 1974, he complained to the union job dispatcher, Jack Sawyer, that he was not in the right place in the out-of-work list. Vandeventer was listed as number 85 in order of preference and he believed he should have been listed at number 20. Sawyer told him, "if I [Vandeventer] didn't like it to go see somebody higher than him."

Vandeventer then contacted Wayne Hopkins, president of the Union, who stated

---

**1.** Section 411(a)(5) provides as follows:

*Safeguards against improper disciplinary action.*—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

**2.** Section 412 provides as follows:

Any person whose rights secured by the provisions of this title have been infringed by

any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

**3.** The Honorable Roy W. Harper, United States District Judge for the Eastern District of Missouri, presiding.

that he would take care of the matter. Hopkins, however, did nothing for Vandeventer.

In February 1975, Vandeventer again complained to Sawyer about his position on the list. The list posted on February 3 did not contain his name; on the February 10 list, he was number 4; on the February 14 list he was not listed; and on February 26, he was listed as number 263, near the bottom of the list. On Sawyer's suggestion, Vandeventer again talked to Hopkins. Vandeventer described the conversation:

> I asked him why I was removed from the list, that "Mr. Sawyer suggested that I talk to you," and I pointed out to him that I had always been a good union member and I asked him if there was any reason why I was being disciplined or being removed off the list and why I wasn't being sent to any jobs. And I asked him if, well, you know, he said, "We are not disciplining you." And I asked him if I should write anything out in writing, make a written complaint. He said, "Don't worry about it. We'll take care of the matter."

Vandeventer's name again disappeared from the list between April 10 and May 16. When he talked to Sawyer about this matter, Sawyer told him "that he had a special list for people, for certain people." Vandeventer again conferred with the president of the Union:

> I again asked him at this time what had happened, if I had did anything wrong to be treated like this and he didn't have any specific answer. And I asked him again if there was anything, any formal complaint that I could write out to take care of this problem because I wasn't being treated fairly.
> * * * Again he told me that I didn't need to write anything out and he would take care of the matter.

Vandeventer believed the Union leadership was deliberately discriminating against him as a method of discipline for past intra-union political activities. In an election held in August 1974, just prior to the time he began having problems with his position on the out-of-work list, Vandeventer had actively supported a slate of candidates opposing the slate headed by Hopkins. Vandeventer's candidates lost the election. He attributed his low position on the job referral list to retribution for those activities.

In August of 1975, Vendeventer attempted to present his complaint of improper discipline, along with evidence of the alleged discriminatory practices, to Leo Beshinski, the Union's international vice president. When Vandeventer was on his way to the meeting, however, an unknown person struck him from behind. He was hospitalized for two weeks and unable to work for three months due to the injuries.

Vandeventer brought this action in May of 1976, alleging that the Union had taken disciplinary action against him without providing him with written charges and a hearing, in violation of 29 U.S.C. § 411(a)(5), that the disciplinary action "consisted of defendant not referring plaintiff to jobs to which he should have been referred," and that the Union's actions were maliciously motivated and resulted from Vandeventer's political activities. Vandeventer alleged that he has lost wages and fringe benefits as a result of the Union's actions, and he sought actual and punitive damages, costs, and attorney's fees.

## II. *Preemption.*

In district court, the Union moved to dismiss the complaint on the following grounds, *inter alia*:

> The matters complained of by Plaintiff fall within the purview of and are preempted by Section 8(b) of the National Labor Relations Act and this Court is without jurisdiction to entertain the complaint of Plaintiff.

The Union raised the same argument in a post-trial motion for judgment n. o. v. or a new trial. The district court denied both

motions. The Union now raises the preemption issue on appeal. We agree with the ruling of the district court.

The Union makes the following argument. In his complaint, Vandeventer charged the Union with discrimination in job referrals. Discrimination in job referrals is an unfair labor practice that falls within the jurisdiction of the National Labor Relations Board (NLRB), *Farmer v. United Brotherhood of Carpenters & Joiners of America*, 430 U.S. 290, 303 nn. 11 & 12, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), and the NLRB has exercised jurisdiction over such charges, *see, e. g., Boilermakers Local Union No. 83, AFL–CIO*, 205 NLRB No. 154 (1973). The federal courts, as well as the state courts, must defer to the exclusive competence of the NLRB with regard to activities that are arguably subject to the National Labor Relations Act. *Vaca v. Sipes*, 386 U.S. 171, 179, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Vandeventer's complaint is therefore preempted by the NLRB, and the district court lacks jurisdiction.

We reject the Union's argument for it misconstrues both the preemption doctrine and the LMRDA. The purpose of the preemption doctrine is to protect a uniform national labor relations policy from interference by state and federal courts. *San Diego Building Trades Council v. Garmon, supra*, 359 U.S. at 241–48, 79 S.Ct. 773. That national policy is established in the first instance by Congress. The preemption doctrine therefore rests on congressional intent. *See Sears, Roebuck & Co. v. San Diego District Council of Carpenters*, —— U.S. ——, 98 S.Ct. 1745 at 1753 n. 12, 56 L.Ed.2d 209 (1978). Congress may originally have intended that the NLRB exercise exclusive jurisdiction over charges of discrimination in job referrals, whether for discipline or other purposes. In enacting the LMRDA in 1959, however, Congress expressed a clear intention to grant federal courts jurisdiction over claims of improper union discipline of members, thereby superseding the exclusive jurisdiction of the NLRB. *Cf. Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, supra*, 98 S.Ct. at 1753 n. 14 (Congress has created numerous exceptions to the Board's exclusive jurisdiction). Thus, the grant of federal court jurisdiction contained in 29 U.S.C. § 412 overrides the preemption doctrine. *See* Beaird and Player, *Union Discipline of Its Membership Under Section 101(a)(5) of the Landrum-Griffin: What is "Discipline" and How Much Process is Due?* 9 Ga.L.Rev. 383, 385–86 (1975); Etelson and Smith, *Union Discipline Under the Landrum-Griffin Act*, 82 Harv.L.Rev. 727, 754–55 (1969).

The legislative history of the LMRDA demonstrates that Congress expressly intended the NLRB and the federal courts to exercise concurrent jurisdiction over cases such as the one before us.

We find the first legislative indication of concurrent jurisdiction in the proceedings leading to the adoption of an amendment to section 411(a)(4).[4] Under that section as enacted, a union may require a member to exhaust intraunion remedies before instituting an action in court or before an administrative agency. That requirement, however, binds the member for only four months. In other words, after seeking a remedy through the union for four months, the member, if unsuccessful, may then institute legal or administrative proceedings. The original bill passed by the Senate

---

4. Section 411(a)(4) provides in relevant part: *Protection of the right to sue.*—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, * * * Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings * * *.

(S.1555), required a member to seek a remedy through union procedures for *six* months. Senator Goldwater criticized this provision, pointing out that the Taft-Hartley Amendments to the National Labor Relations Act imposed a six-month statute of limitations on unfair labor practice charges. If intraunion procedures lasted six months or longer, an aggrieved member would be unable to file charges with the NLRB.[5] The House version of this section reduced the six-month period to four months for the express purpose of enabling an aggrieved member to pursue remedies before the NLRB.[6] The Senate agreed to this amendment.

This history of section 411 indicates that Congress intended union members to have remedies before both the federal courts and the NLRB. This history contains no suggestion that the member must first resort to the NLRB in such a case. Indeed, such a requirement would be contrary to the purpose of section 412, which provides a remedy in federal court.

The second indicator of concurrent jurisdiction is disclosed by amendments to the provision that became 29 U.S.C. § 529. Because the language of section 529 is almost identical to that of section 411, its legislative history is relevant to interpreting section 411 as well. Originally passed by the Senate as section 607 of S.1555, this provision imposed criminal penalties for a variety of union actions, including improper discipline and use of force or violence.[7] The House version, which ultimately became law, retained criminal penalties for the use of force or violence but imposed only civil penalties for improper discipline. The House reasoned as follows:

> In our judgment, the conduct prohibited by this section is generally comparable to conduct described as an unfair labor practice under the Taft-Hartley Act and, accordingly, we do not believe that criminal sanctions are warranted. [105 Cong.Rec. 13091 (daily ed. July 27, 1959), II *Leg. Hist.* 1522.]

Thus, Congress reaffirmed its understanding that the LMRDA would afford remedies in federal court for conduct already within the jurisdiction of the NLRB under provisions of the National Labor Relations Act.

■ The legislative history of the LMRDA also leads us to reject a primary premise of the Union's argument: that the LMRDA protects only *membership* rights, not *employment* rights. While the LMRDA was intended to govern only internal union affairs, Congress recognized that interference with employment rights constituted a powerful tool by which union leaders could control union affairs, often in violation of workers' membership rights. The congressional debates illustrate some of the abuses Congress sought to curb:

5. 105 Cong.Rec. 6847 (daily ed. May 7, 1959), *reprinted in* II NLRB, *Legislative History of the Labor-Management Reporting and Disclosures Act of 1959,* 1270 (1959) [hereinafter cited as "*Leg. Hist.*"].

6. 105 Cong.Rec. 13089 (daily ed. July 27, 1959), II *Leg. Hist.* 1520.

7. Section 607 in S.1555 read as follows:
   Sec. 607. (a) It shall be unlawful for any labor organization, its officers, agents, representatives, or employees, to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act.
   (b) It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, or by econom-

> ic reprisal or threat thereof, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercising by such member of any right to which he is entitled under the provisions of this Act.
>    (c) Any person who shall willfully violate the provisions of this section, shall be fined not more than $10,000 or imprisoned for not more than two years, or both. [I *Leg. Hist.* 575–76.]

The House version divided § 607 into two sections now codified at 29 U.S.C. §§ 529, 530. Section 529 contains the same language as § 607(a), with the addition of one sentence: "The provisions of section 412 shall be applicable in the enforcement of this section."

They are afraid of reprisals against them. Two waitresses from Chicago testified that it required 6 months to get a job. [105 Cong.Rec. 5811 (daily ed. Apr. 22, 1959), II *Leg. Hist.* at 1103 (comments of Sen. McClellan).]

\* \* \* \* \* \* ·

There is a great deal more involved than a $10 fine, if union officials can expel a member from the lodge and keep him from working. [*Id.*]

\* \* \* \* \* \*

While this aggrieved member is exhausting the remedies provided by the laws of the national organization \* \* \* he has lost his home, and his children, if any, are approaching starvation. If he lives in a community that is well organized he cannot possibly get employment while pursuing the rather devious processes by which he might exhaust the remedies available to him under these bills[.] [105 Cong.Rec. 14337 (daily ed. Aug. 12, 1959), II *Leg. Hist.* at 1613 (comments of Rep. Loser).]

Because Congress recognized the close relationship between membership rights and employment rights, we believe that Congress did not intend to draw a strict distinction between the two in enforcement of rights protected by the LMRDA.

The circumstances of the instant case give rise to a more specific question: whether discrimination in job referrals (a particular type of violation of employment rights) can constitute discipline (a particular type of violation of membership rights) under section 411(a)(5). Courts and commentators have disagreed on the answer to this question. *See* Beaird and Player, *supra*, 9 Ga.L.Rev. at 392–93; Etelson and Smith, *supra*, 82 Harv.L.Rev. at 732–33. We need not decide the question in the present case, however, because the Union has not raised the issue on appeal. In fact, in district court, the Union offered, and the court accepted, the following jury instruction:

"Discipline" in these instructions refers to the intentional failure and refusal of Local 513 to refer plaintiff to jobs he was qualified to perform for the purpose of punishing plaintiff for his inter-union activities.

Thus, the Union conceded the jury might determine that discrimination in job referrals in this case constituted discipline under the LMRDA.

■ We conclude that the district court properly rejected the preemption argument upon which the Union's motions for dismissal and judgment n. o. v. rested.

### III. *Exhaustion.*

■ In its motion for judgment n. o. v. or a new trial, the Union argued that Vandeventer failed to exhaust his intraunion remedies. The district court denied the motion, and the Union raises the same issue on appeal. The LMRDA authorizes unions to require members "to exhaust reasonable hearing procedures" within the union before instituting legal or administrative proceedings. 29 U.S.C. § 411(a)(4). The Union's constitution, in art. XXIII, subdiv. 7, section (m), p. 105, sets forth elaborate procedures by which a member or officer (the "complainant") files charges against a member (the "defendant") and a trial is conducted before discipline is imposed on the defendant. We find no description of procedures by which a member such as Vandeventer, who suspects that he is the subject of wrongful disciplinary action, can bring charges or initiate an inquiry. In fact, Vandeventer twice asked Hopkins, the union president, whether he could file such a charge, and in both instances Hopkins said he could not. We conclude that the Union has established no procedures for Vandeventer to exhaust and that the district court properly denied the Union's motion.

### IV. *Sufficiency of the Evidence.*

■ The Union contends that the evidence was insufficient to support the jury

verdict, including the award of punitive damages. Although Vandeventer's case rested primarily on circumstantial evidence, we find sufficient evidence to support the jury's finding under the instructions that the Union had taken disciplinary action against him. This determination also furnishes an adequate basis for the jury to have concluded that the Union officials acted maliciously, thereby justifying the award of punitive damages. *See International Brotherhood of Boilermakers v. Braswell,* 388 F.2d 193, 199 (5th Cir.), *cert. denied,* 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968). The Union did not object to the jury instruction on punitive damages.[8] Under the circumstances of this case, the decision whether to award punitive damages rested with the jury, and adequate evidence supported its conclusion. We therefore reject the Union's argument.

### V. *Attorney's Fees.*

In his complaint, Vandeventer requested attorney's fees along with other forms of relief. After the jury had returned its verdict, Vandeventer's counsel filed a motion for allowance of attorney's fees, along with a detailed list of time spent in preparing the case. The court denied the motion on the following ground:

> While the plaintiff in his petition sought attorney's fees, no proof was offered during the jury trial with respect to attorney's fees, nor did the plaintiff request the Court to give any instruction with respect to attorney's fees.

On cross-appeal, Vandeventer contends that the district court erred in denying the motion.

▮ The power to award attorney's fees in LMRDA actions arises from the traditional equitable power of federal courts to award such fees when the interest of justice so requires and from the language of 29 U.S.C. § 412, which broadly authorizes the court to grant "such relief * * * as may be appropriate." *Hall v. Cole,* 412 U.S. 1, 5, 10–11, 93 S.Ct. 1943, 1948, 36 L.Ed.2d 702 (1973). That power rests with the district court, to be exercised in its discretion. The district court here erred in concluding that the question of attorney's fees must be decided by the jury.

We express no opinion on whether Vandeventer is entitled to attorney's fees. Instead, we remand to the district court to determine this issue under the principles enunciated in *Hall v. Cole, supra.*

We affirm, but remand for further consideration on the question of attorney's fees.

---

8. The district court instructed the jury:

> If the jury should find from a preponderance of the evidence in this case that plaintiff Edward L. Vandeventer, Jr. is entitled to a verdict for actual damages, and you should further find that the acts or omissions of the defendant Local Union 513, which proximately caused actual injury or damage to the plaintiff, Edward L. Vandeventer, Jr. were maliciously done, then the jury may, if in the exercise of discretion unanimously chose so to do, add to the award of actual damages such amount as the jury shall unanimously agree to be proper as punitive damages.
>
> An act or failure to act is maliciously done if prompted or accompanied by ill will or spite or grudge either toward the injured person individually or toward all persons in one or more groups or categories of which the injured person is a member.